# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REGIONAL PRODUCE COOPERATIVE CORPORATION,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **NO. 19-1883** |
| | : | |
| **TD BANK, N.A.** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.** **December 12, 2022**

## <u>MEMORANDUM OPINION</u>

This case involves the extent to which a bank is responsible for the embezzlement of funds by a bank customer's Chief Executive Officer. Plaintiff, Regional Produce Cooperative Corporation ("RPCC"), was the victim of an extensive, multi-million dollar embezzlement scheme by its former President and CEO, Sonny "Caesar" DiCrecchio. RPCC's complaint, originally filed in state court, alleged that T.D. Bank, N.A. ("TD Bank") permitted and facilitated this scheme. That complaint set forth allegations of common law negligence, negligence under the Pennsylvania Commercial Code, conversion under the Pennsylvania Commercial Code, and common law aiding and abetting conversion. On May 1, 2019, TD Bank removed the case to federal court.

TD Bank now moves for summary judgment on all of RPCC's claims. For the following reasons, I will grant judgment in favor of TD Bank on all claims except for the statutory negligence claim relating to transactions appearing on bank statements after August 16, 2017.

## I.     STATEMENT OF FACTS

For general background purposes, the following facts are derived from the evidence submitted by the parties and the parties' statements of facts.  Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view those facts and evidence in the light most favorable to RPCC.  Facts recited by the parties but not pertinent to the issues at hand are not included.[1]

### A.     <u>General Background</u>

RPCC is a Pennsylvania non-profit cooperative corporation that operates the Philadelphia Wholesale Produce Market ("the Market"), the world's largest fully-refrigerated wholesale produce market.  The Market is open to the public and gathers dozens of wholesale produce merchants in a central location to supply fresh produce to the greater Philadelphia region.  Those merchants are also shareholders of RPCC and eligible to serve as volunteer, unpaid members its Board of Directors (the "Board").  (PSUF ¶ 1; DR ¶ 1.)

Prior to the creation of RPCC, its predecessor, the Philadelphia Fresh Food Terminal Corporation ("PFFTC"), operated a smaller wholesale produce market at a different location in Philadelphia.  On July 14, 2008, in anticipation of forming the current and larger market, PFFTC created RPCC as a Pennsylvania non-profit corporation.  (PSUF ¶ 2; DR ¶ 2.)  After the Market opened in 2011, RPCC took over its operations, and, following a brief period of co-mingled operations, PFFTC ceased operating.  (PSUF ¶ 3; DR ¶ 3.)  At all relevant times, Caesar "Sonny"

---

[1]     Where facts are undisputed, I will reference the parties' pleadings as follows: Defendant's Statement of Undisputed Facts ("DSUF"); Plaintiffs' Response ("PR"), Plaintiffs' Statement of Undisputed Facts ("PSUF"), and Defendant's Response ("DR").  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute without resolving it.  I will not rely on any statement of fact that is unsupported by reference to a specific exhibit.

DiCrecchio was the President and Chief Executive Officer of PFFTC and then RPCC.  (PSUF ¶ 5; DR ¶ 5.)  Patricia Pumphrey was PFFTC's accounts payable clerk and bookkeeper and assumed those same roles for RPCC.  (PSUF ¶ 6; DR ¶ 6.)

### B.      The Banking Relationship Between RPCC and TD Bank

In 1998, PFFTC commenced a banking relationship with TD Bank by opening a Business Statement Savings Account, with the account number ending in -5470.  (DSUF ¶ 2; PR ¶ 2.)  On May 25, 2000, DiCrecchio opened a new account for PFFTC, with an account number ending in -3085.  (DSUF ¶ 4; PR ¶ 4.)  The "Temporary Signature Card" for that account (-3085) indicated that DiCrecchio was the only authorized signer and that only one signature was required for checks drawn on the account.  (Def.'s Ex. 3.)  PFFTC's Board members knew that DiCrecchio was an authorized signer on the -3085 account but believed that there were other signers on the account. (Dep. of George Binck ("Binck Dep."), 207:9–21; Dep. of George Manos ("Manos Dep."), 76:24–77:5.)

In 2009, PFFTC was the victim of a check-counterfeiting ring unrelated to the embezzlement at issue here.  (DSUF ¶ 8; PR ¶ 8.)  Following discovery of this fraud, TD Bank offered PFFTC several options, one of which was closing the compromised account and opening a new one.  (Def.'s Ex. 88.)

On July 31, 2009, TD Bank, through DiCrecchio, issued PFFTC a new account, with the account number ending in -5031 (the "-5031 Account").  (Def.'s Ex. 2.)  At the time DiCrecchio opened the -5031 Account, the new Market was not yet operational, and, as such, the -5031 Account was opened in PFFTC's name, not RPCC's name.  (Def.'s Ex. 2; DSUF ¶ 22; PR ¶ 22.) The -5031 Account was created as a single-signer account, with DiCrecchio as the sole signer. (DSUF ¶¶ 11–12; PR ¶¶ 11–12.)  PFFTC and, subsequently, RPCC's Board members still believed

that two signers were required on every check.  (Dep. of Louis Penza ("Penza Dep.") 99:23–100:19; Dep. of John Vena ("Vena Dep.") 32:10–17); Dep. of John DeFeliciantonio ("DeFeliciantonio Dep.") 57:5–20) Binck Dep. 209:16–209:20; Dep. of Thomas Fleming ("Fleming Dep.") 66:12–68:17.)

DiCrecchio had opened two prior accounts with TD Bank on PFFTC's behalf.  Thus, when signing the Business Signature Card for the -5031 Account, DiCrecchio confirmed that he again had the required authority to act with respect to the -5031 Account and that TD Bank had "no responsibility or duty to assure or verify that [DiCrecchio] ha[d] or [was] acting within the authority given [him] by the authorizing document or that such authorizing document [was] genuine or valid." (Def.'s Ex. 2.)  DiCrecchio's signatory authority on checks was permitted under Section 17.1 of RPCC's Bylaws, which  stated that, "[t]he Board shall designate the President/CEO, and, if so desired, one or more other officers or other persons who shall sign all checks or demands for money and notes of the Corporation." (Def.'s Exs. 4, 6.)  The Bylaws, however, also provided that "[a]ll sums received by the Corporation shall be deposited in its name in such bank as may be designated by the board of Directors."  (Def.'s Ex. 4 § 10.10.)  PFFTC and RPCC Board Member Louis Penza testified that he could not recall any meeting by the Board authorizing the opening of the -5031 account.  (Penza Dep. 10:17–11:18; 196:11–197:24.)

When DiCrecchio opened the -5031 Account, TD Bank required him to complete two forms:  (1) a "For Profit Banking Resolution," and (2) a "Business Signature Card."  (Def.'s Exs. 2, 9; PSUF ¶ 13; DR ¶ 13.)  The For Profit Banking Resolution provided a space for the "Secretary of the Corporation" to certify (a) the correct name and address of the Corporation, and (b) that the Corporation, via a meeting of the Board of Directors of the Corporation, adopted a resolution making TD Bank the Corporation's financial institution.  (Def.'s Ex. 9.)  The only signature on the

Resolution was that of DiCrecchio, who was neither a member of the Board nor the Corporate Secretary.  (Def.'s Ex. 9.)   According to TD Bank, its policies did not require that all the information on these forms be filled in.  (Dep. of Joseph Robinson ("Robinson Dep.") 126:7–127:13; Dep. of Danielle McMahon ("McMahon Dep.") 104:17–105:18.)

The Business Signature Card designated individuals who were "authori[zed] to act with respect to th[e] account," stating:

> The Authorized Individual(s) signing agree(s), jointly and severally if multiple signers, to the terms set forth in the Deposit Account Rules and Disclosure, as amended by "Bank" from time to time. Each of the Authorized Individual(s) signing also acknowledge that "Bank" provided at least one copy of these deposit account documents.

(PSUF ¶ 17; DR ¶ 17, Def.'s Ex. 2.)  The Business Signature Card also had spaces for the following information to be filled in:  "Account Purpose"; "Account Type"; "Date Opened"; and "Special Instructions."  (Def.'s Ex. 2.)  On the Business Signature Card for the -5031 Account, only the "Date Opened" and "Account Type" fields were completed.  (Id.)  DiCrecchio signed the Business Signature Card indicating that he agreed to the terms of TD Bank's Deposit Account Rules and Disclosure ("Account Agreement") and had received a copy of the Account Agreement.  (Id.)

TD Bank's representative testified that the bank always provided a copy of its Account Agreement to every customer.  (Robinson Dep. 92:3–8; 148:11–23.)  The Account Agreement contained the following relevant language:

> **No Two-Signer Accounts.**  We do not offer accounts on which two or more signatures are required for a check or other withdrawal. Notwithstanding any provisions to the contrary on any signature card or other agreement you have with us, you agree that if any Account purports to require two or more signers on items drawn on the Account, such provision is solely for your internal control purposes and is not binding on us.  If more than one person is authorized to write checks or draw items on your Account, you agree that we can honor checks signed by any Authorized Signer, even if

5

there are two or more lines on the items for your signature and two signatures are required.

. . .

**ACCOUNT STATEMENT.**  You are responsible for promptly examining your statement each statement period and reporting any irregularities to us.  The periodic statement will not be considered correct for all purposes and we will not be liable for any payment made and charged to your Account unless you notify us in writing within certain time limits after the statement and checks are made available to you.  We will not be liable for any check that is altered or any signature that is forged unless you notify us within a reasonable period of time, not to exceed thirty (30) calendar days after the statement and the altered or forged item(s) are made available.  Also, we will not be liable for any subsequent items paid, in good faith, containing an unauthorized signature or alternation by the same wrongdoer unless you notify us within Thirty (30) calendar days after the statement and first altered or forged items were made available. . . .

. . .

**Business Accounts.**  If the Account is not owned by a natural person (a corporation, partnership, limited liability company, sole proprietorship, unincorporated associations, etc.) then the Account Holder must provide evidence to our satisfaction of the authority of the individuals who sign the signature card to act on behalf of the Account Holder.  On any transactions involving the Account, we may act on the instructions of the person(s) authorized in the resolutions, banking agreement, or certificate of authority to act on behalf of the Account Holder.  You agree to notify us in writing of any changes in the person(s) authorized or the form of ownership . . . .

(Def.'s Ex. 67.)

DiCrecchio testified at his deposition that—as indicated by his signature of the Bank Signature Card—he had no reason to doubt that he received a copy of the Account Agreement at the time of the -5031 Account opening.  (Dep. of Caesar DiCrecchio ("DiCrecchio Dep."), 177:13–178:1.)  No one at TD Bank, however, could specifically confirm that they had given the Account Agreement to DiCrecchio, and RPCC contends that the record is devoid of evidence that DiCrecchio, PFFTC, or RPCC ever received a copy of this document.  (Id. at 92:3–93:16; PR ¶ 18.)

### C.   **RPCC is Formed**

On July 14, 2008, PFFTC created RPCC as a new non-profit cooperation for the purpose of entering into contracts to build a newer and more up-to-date building for the Market.  (DSUF ¶ 21; PR ¶ 21.)  This building opened on June 5, 2011, and PFFTC's business was transitioned to and conducted by RPCC around that time.  (DSUF ¶ 22; PR ¶ 22.)  Even though the -5031 Account was opened in PFFTC's name, both PFFTC and RPCC's funds passed through that Account. (DSUF ¶ 23; PR ¶ 23.)

The parties dispute whether or not either PFFTC or RPCC informed TD Bank about PFFTC's name change or the change in the -5031 Account's ownership prior to October 2012. (DSUF ¶ 24; PR ¶ 24; Pl.'s Ex. 48.)  Emails from October March 2011, September 2012, and October 2012 reflect internal RPCC discussions between PFFTC's and RPCC's bookkeeper/office manager Patricia Pumphrey and DiCrecchio regarding the documentation required to effectuate a name change.  (Def.'s Ex. 44 (March 21, 2011 email); Def.'s Ex. 45 (September 28, 2012 email); Def.'s Ex. 46 (Oct. 5, 2012 email); Def.'s Ex. 47 (Oct. 12, 2012 email).)  Around this same time, RPCC requested that additional signers, along with DiCrecchio, be added by TD Bank to the -5031 Account as individuals authorized to transact on behalf of RPCC.  (DSUF ¶¶ 27–28; PR ¶¶ 27–28; PSUF ¶¶ 44–45; DR ¶¶ 44–45.)  On Thursday, October 11, 2012, Pumphrey emailed Stephanie Talotti of TD Bank, attaching information on four new signers and requesting that TD Bank personnel come by that afternoon to complete paperwork.  (Pl's Ex. 48.)  Talotti responded the next day indicating that she had been out but would get back in touch with Pumphrey the following Monday.  (Pl.'s Ex. 49.)  Ultimately, TD Bank employees and Pumphrey/DiCrecchio agreed to meet on October 18, 2012 to complete the organization's name change.  (Pl.'s Ex. 50.) For reasons unexplained in the record, the name change/change of account ownership was never

completed at that time.  (PSUF ¶ 49; DR ¶ 49.)  The record contains only one other email from Pumphrey to TD Bank, dated November 30, 2016, wherein Pumphrey asked Cecilia Zepp of TD Bank to "Please remind Sonny [DiCrecchio] to have the name changed when is thru with the wire transfer."  (Def.'s Ex. 54.)  There is no evidence regarding what happened with that request.

Although PFFTC, and later RPCC, ordered checks with two signature lines for the -5031 Account, those checks were not ordered through TD Bank, but rather through a third-party vendor, Orbis Solutions.  (DSUF ¶ 33; PR ¶ 33.)  The parties agree that RPCC Board members were aware of the -5031 Account but dispute whether the Board was aware that the account was still only in PFFTC's name.  (DSUF ¶ 35; PR ¶ 35; see also Penza Dep. 234:1–9; DiFeliciantonio Dep. 68:20– 24.))  Nonetheless, it is undisputed that RPCC Board members repeatedly signed off on checks for the -5031 Account.  (Manos Dep. 235:19–237:21; DiFeliciantonio Dep. 151:16–153:22; Penza Dep. 43:16–44:19; Binck Dep. 22:24–25:22.)

### D. DiCrecchio's Embezzlement Scheme

DiCrecchio's embezzlement started in 2006 and lasted until he confessed to RPCC's Board on August 14, 2018.  (DSUF ¶ 29; PR ¶ 29.)  From 2011 to 2018, DiCrecchio used only the -5031 Account to embezzle funds from RPCC.  (Id.)  On August 16, 2018, RPCC notified TD Bank that DiCrecchio had been terminated.  (DSUF ¶ 30; PR ¶ 30.)  Although DiCrecchio admitted to embezzling a total of $8,686,300.63, only $5,493,707 passed through the -5031 Account.  (DSUF ¶ 31; PR ¶ 31; Pl.'s Ex. B.)

DiCrecchio's scheme was carefully constructed.  For legitimate business expenses, DiCrecchio would direct Patricia Pumphrey to sign his name and to obtain a Board member's signature on checks.  (DSUF ¶ 34; PR ¶ 34.)  Board member Louis Penza explained that when presented with checks for a second signature, he would verify the related bills provided to him.

(Penza Dep. 142:1–9.)  For fraudulent expenses, DiCrecchio would have Pumphrey obtain only one signature on a check—that of DiCrecchio—without obtaining a second signature.  (DSUF ¶ 36; PR ¶ 36; Pumphrey Dep. 172:7–17.)  To hide his fraud, DiCrecchio directed Pumphrey to record all fraudulent payments as legitimate business expenditures, for example as maintenance, snow removal, insurance legal fees, and other false codes.  (DSUF ¶ 37; PR ¶ 37.)  Importantly, no one from RPCC ever reported any unauthorized transaction to TD Bank until after DiCrecchio's confession in August 2018.  (DSUF ¶ 38; PR ¶ 38.)

Pumphrey testified that she suspected that many of the transactions were fraudulent over a period of years but never raised this concern with anyone on the boards of PFFTC or RPCC.  (Pumphrey Dep. 25:7–26:23.)  She also testified that for each of the months that she was the accounts payable clerk, she would receive the monthly bank statement for the -5031 Account and either the actual checks or check images.  (Pumphrey Dep. 44:2–9.)

### E.      DiCrecchio's Use of Embezzled Funds

Beginning in 2006, DiCrecchio began embezzling funds to pay for the rent and maintenance of a $2.25 million dollar home in Stone Harbor, New Jersey.  (DSUF ¶ 42; PR ¶ 42.)  DiCrecchio directed Pumphrey to write monthly checks payable to "Jonathan Advisors" for rent on the Stone Harbor house.  (Pumphrey Dep. 57:1–59:14; DiCrecchio Dep. 25:11–26:4.)  The parties agree that, beginning in 2009, the embezzled funds came from PFFTC.  (DSUF ¶¶ 42–43; PR ¶¶ 42–43.)  Beginning in 2014, DiCrecchio ceased writing checks directly to Jonathan Advisors and, instead, directed Pumphrey to write monthly checks to two other fictitious companies.  (DSUF ¶ 44; PR ¶ 44.)  DiCrecchio would cash these checks at United Check Cashing and convert them to money orders used for paying rent on the Stone Harbor house.  (DSUF ¶ 45; PR ¶ 45.)  Sometime in 2017, United Check Cashing started demanding documentation showing DiCrecchio's

affiliation with the companies to which the checks were written.  (DiCrecchio Dep. 129:22–131:18.)

DiCrecchio then started directing Pumphrey to make checks payable to "Ferguson Dechert," the subsequent property manager of the Stone Harbor house.  (DSUF ¶ 48; PR ¶ 48.) DiCrecchio directed Pumphrey to designate these payments in QuickBooks as "Trash and Recycling."  (DSUF ¶ 49; PR ¶ 49.)

In a similar pattern, DiCrecchio embezzled from the Market by directing Pumphrey to write checks payable to DiCrecchio or to a fictitious entity, which would be cashed at United Check Cashing, to pay millions of dollars to friends, relatives, and organizations unrelated to the Market's operations, to make contributions to various charities and local organizations such as string bands, and to pay to Market co-workers excess compensation not approved by the Board.  (DSUF ¶ 51; PR ¶ 51.)  Additionally, DiCrecchio embezzled cash from RPCC by diverting incoming checks intended for the Market for pallet sales, and skimming cash from the Market's pay gate, which was then distributed to numerous Market employees as additional cash compensation.  (DSUF ¶ 53; PR ¶ 53.)

In 2014, DiCrecchio made an unauthorized $180,000 loan to John DiFeliciantonio, an RPCC Board member and Board Secretary.  (DSUF ¶ 40; PR ¶ 40.)  DiFeliciantonio testified that, "[a]s far as [he] knew, [the loan] was from Caesar DiCrecchio, not the RPCC."  (DiFeliciantonio Dep. 171:20–172:2.)  He stated that he did not know the funds came from an RPCC account until later.  (Id. at 172:4–8.)

### F.   RPCC's Receipt of Bank Statements

TD Bank sent monthly bank statements for the -5031 Account to "PFFTC" at the address of 6700 Essington Avenue, which was the same address used by RPCC when it took over the

Market.  (Def.'s Ex. 31–38, 77, 264; DSUF ¶ 55; PR ¶ 55.)  Pumphrey and DiCrecchio were responsible for reviewing monthly account statements for RPCC.  (Binck Dep. 119:24–21; Pumphrey Dep. 40:12–41:24, 43:6–45:20.)  The monthly account statements showed that hundreds of checks written from the -5031 Account only had DiCrecchio's signature and that regular payments were made to Jonathan Advisors.  (DSUF ¶ 58; PR ¶ 58; Def.'s Ex. 263.)  It is undisputed that Pumphrey and DiCrecchio were the only individuals who ever reviewed PFFC or RPCC bank statements prior to DiCrecchio's confession; no one else at RPCC was designated to review monthly account statements.  Board members did not raise concerns about not receiving bank statements.  (Binck Dep. 18:3–21:13; Penza Dep. 31:14–33:7, 37:1–13, DiCrecchio Dep. 56:4–13; Dep. of Mark Levin ("Levin Dep.") 78:5–14; Vena Dep. 71:15–72:11.)  Several RPCC Board members admitted that if they had looked at the statements, they would have seen that DiCrecchio was signing checks with only one signature.  (Penza Dep. 45:5–20, Binck Dep. 68:23–69:12, 233:6–241:21.)

Notes from the July 2018 Board Meeting indicate that George Manos stated that he had become "concerned about the bank balances [RPCC] maintain[s] and proposed each Board member receives the balances and account activity for each account on the 1st, 15th, and 30th of each month."  (Def.'s Ex. 91.)  Manos "reiterated that these requests were to satisfy the Board's responsibility to know what is happening with RPCC's financials."  (Id.)  RPCC contends that it, acting through its Board, was unaware of any unauthorized transactions until after DiCrecchio's confession.  (DSUF ¶ 64; PR ¶ 64.)  RPCC further posits that prior to DiCrecchio's confession, it believed that additional signers were required.  (DSUF ¶ 65; PR ¶ 65; Vena Dep. 32:6–18; Penza Dep. 190:6–191:1.)

RPCC ultimately closed the -5031 Account following DiCrecchio's confession.  (PSUF ¶ 50; DR ¶ 50.)

### G.        Procedural History

On April 11, 2019, RPCC brought suit against TD Bank for (a) common law negligence, (b) negligence under the Pennsylvania Uniform Commercial Code ("UCC"), 13 Pa.C.S. §§ 3405 and 3406, (c) conversion of instruments under the Pennsylvania UCC, 13 Pa.C.S. § 3420, and (d) aiding and abetting conversion.  After TD Bank filed a Federal Rule of Civil Procedure 12(b)(6) motion, I dismissed both the common law negligence claim to the extent it was based on the Bank Secrecy Act and the claim for aiding and abetting conversion.

TD Bank has now filed the current Motion for Summary Judgment seeking judgment on all remaining claims.

## II.        STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states, in pertinent part:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  "Through summary adjudication, the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality."  Capitol Presort Servs., LLC v. XL Health Corp., 175 F. Supp. 3d 430, 433 (M.D. Pa. 2016).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis to allow a reasonable fact-finder to return a verdict for the non-moving party.  Id.

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine, triable issues.  Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  Once the moving party satisfies its burden, the non-moving party must, in rebuttal, present sufficient evidence of a genuine issue.  Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015).  The court must then resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana v. Kmart Corp, 260 F.3d 228, 232 (3d Cir. 2001).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Twp. of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

## III.   DISCUSSION

### A.   Statutory Negligence Claim (Count II)

TD Bank first seeks summary judgment regarding RPCC's UCC negligence claim under 13 Pa.C.S. § 3406, which pertains to assertions of "[n]egligence contributing to forged signatures or alteration of instruments."  TD Bank contends that this claim is barred by the limitations set forth in the companion provision of 13 Pa.C.S. § 4406.

Any claim brought under the UCC is, as a general rule, subject to a three-year statute of limitations. 13 Pa. Cons. Stat. § 4111.  For certain actions between a payor bank and its customer, that limitations period is further modified by 13 Pa.C.S. § 4406, which describes a customer's obligation to report unauthorized signatures or alterations upon receipt of a bank statement:

> **Duty of customer to discover and report unauthorized signature or alteration**
>
> **(a)   Statement of account.—**A bank that sends or makes available to a customer a statement of account showing payment of items for the account shall either return or make available to the customer the items paid or provide information in the statement of account sufficient to allow the customer reasonably to identify the items paid. The statement of account provides sufficient information

if the item is described by item number, amount and date of payment.

**(b)      Retention of items.**—If the items are not returned to the customer, the person retaining the items shall either retain the items or, if the items are destroyed, maintain the capacity to furnish legible copies of the items until the expiration of seven years after receipt of the items. A customer may request an item from the bank that paid the item, and that bank must provide in a reasonable time either the item or, if the item has been destroyed or is not otherwise obtainable, a legible copy of the item.

**(c)      Duty of customer.**—If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

**(d)      Effect of failure to report unauthorized signature or alteration.**—If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

(1) the customer's unauthorized signature or any alteration on the item if the bank also proves that it suffered a loss by reason of the failure; and

(2) the customer's unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

**(e)      Allocation of loss.**—If subsection (d) applies and the customer proves that the bank failed to exercise ordinary care in paying the item and that the failure substantially contributed to loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss. If the

customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply.

**(f)   Statutes of limitations applicable to customer.**--Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (subsection (a)) discover and report the customer's unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration.

13 Pa. Const. Stat. § 4406.

Two portions of this provision are particularly relevant to the issues before me.  First, it is a general principle that if the customer notifies the bank within one year of discovering an unauthorized signature or alteration, the customer retains his/her right to bring suit within the general three-year statute of limitations period of § 4111.  Bucci d/b/a Envt'l Equip. & Serv. Co. v. Wachovia Bank, N.A., 591 F. Supp. 2d 773, 785 (E.D. Pa. 2008).  But, under § 4406(b), if the customer fails to notify the bank of an unauthorized signature within one year of receiving a statement "sufficient to allow the customer reasonably to identify the items paid," the customer "loses his or her right to bring suit on those claims regardless of the otherwise applicable statute of limitations."  Id.  Often referred to as the statute of repose, "subsection (f) is a powerful weapon for banks because it places the risk of loss squarely on customers after one year has passed."  Envt'l Equip. & Serv. Co. v. Wachovia Bank, N.A., 741 F. Supp. 2d 705, 715 (E.D. Pa. 2010).  "[S]ection 4406(f) is not a statute of limitations per se, but rather 'a precedent to an action which, unlike a statute of limitations, cannot be tolled.'"  Bucci, 591 F. Supp. 2d at 785 n.9 (quotation omitted).

The limitations period for bringing a cause of action against a bank is further narrowed by § 4406(d).  Under this section, if, upon receipt of a statement, a bank customer fails to comply with his burden of notifying the bank of an unauthorized signature or altered item within a reasonable period of time, not exceeding thirty days, the customer is precluded from asserting

claims related to unauthorized signatures or alterations by the same wrongdoer on any other item paid in good faith by the bank before any notice is received.  13 Pa. Cons. Stat. § 4406(d).  This principle is known as the "Repeater Rule" or the "Same Wrongdoer" rule.  See Grodner & Assoc. v. Regions Bank, 766 F. App'x 12, 14 (5th Cir. 2019) (noting that this rule imposes on the customer the risk of loss on all subsequent forgeries by the same wrongdoer after the customer had a reasonable time to detect an initial forgery if the bank has honored subsequent forgeries prior to notice).

The potential interplay between these two rules is nuanced and perhaps can be explained through a hypothetical.  Under § 4406(f) (the statute of repose), if the account holder receives statements on May 1, 2022, June 1, 2022, and July 1, 2022, each reporting a fraudulent check written by different wrongdoers, the account holder has one year from each statement—i.e. until May 1, 2023, June 1, 2023, and July 1, 2023 respectively—to report that fraud to the bank.  If, however, the fraudulent checks shown on each statement are written by the same wrongdoer, § 4406(d) (repeater rule) comes into play.  In order to bring claims regarding the fraudulent checks written by the same wrongdoer noted on the June 1, 2022 and July 1, 2022 statements, the account holder would have to report the fraud within thirty days of the May 1, 2022 statement.  If the account holder does not do so, they are precluded from bringing any claims against the bank regarding those checks in the June 1, 2002 and July 1, 2022 statements, but may still maintain a cause of action against the bank on the check appearing on the May 1, 2022 statement, so long as the fraud is reported to the bank by May 1, 2023.

Relying on § 4406(f) and (d), TD Bank argues that RPCC is precluded, as a matter of law, from asserting any claims for unauthorized payments by DiCrecchio.  TD Bank points out that the evidence is undisputed that TD Bank sent monthly account statements to RPCC's address showing

all monthly activity on the -5031 Account—from September 2009 to August 2018.  (Def.'s Exs. 31–38.)  TD Bank also notes that RPCC's and PFFTC's agent, Patricia Pumphrey, confirmed that she received and reviewed the statements for the -5031 Account every month since the -5031 Account was opened in July 2009.  (Pumphrey Dep. 38:17–45:20.)  TD Bank also stresses that DiCrecchio's unauthorized transactions appeared on those account statements, including, for example, the September 2009 account statement, showing check images with only DiCrecchio's signature and the May 2011 account statement showing a check to Jonathan Advisors for $20,000. Importantly, RPCC concedes that none of its Board members or employees ever reported any unauthorized transactions to TD Bank until after DiCrecchio's confession in August 2018. Because RPCC did not file suit until April 11, 2019, TD Bank urges that, pursuant to the statute of repose in § 4406(f) and the Repeater Rule of § 4406(d), RPCC is precluded from recovery for any unauthorized transactions in this case.

RPCC responds raising five arguments regarding the application of these statutory provisions:  (1) both provisions require that a bank act in good faith; (2) TD Bank's failure to exercise ordinary care under § 4406(e) requires that it bear liability for some of the loss; (3) neither provision applies unless the bank sends or makes available to a *customer* a statement of account showing payment of items for the account; (4) for either the Repeater Rule or the statute of repose to apply, the customer must have failed to discover the unauthorized payment in a situation in which it was reasonable for the customer to do so; and (5) a bank's fraudulent concealment of the embezzlement precludes reliance on the limitations set out in § 4406(f) and (d).  I address each of these arguments below.

1.     Whether TD Bank Was Required to Act in Good Faith

RPCC first argues that TD Bank is barred from relying on either the one-year statute of repose of § 4406(f) or the Repeater Rule of § 4406(d) because TD Bank failed to act in good faith. The Pennsylvania UCC imposes a general duty of good faith on parties to a commercial contract. See 13 Pa. Cons. Stat. § 1304 (providing that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement."); John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 706 (Pa. Super. Ct. 2003) ("Pennsylvania courts impose a general duty of good faith performance on each party in general commercial contracts."). Here, the question is whether this duty of good faith is automatically imported into § 4406 and limits a defendant bank's ability to rely on the limitations in that provision. Because the good faith analysis is different for the one-year statute of repose in § 4406(f) and the Repeater Rule in § 4406(d), each must be addressed separately.

a.     Good Faith—The Statute of Repose in § 4406(f)

Section 4406(f) explicitly states that it applies "[w]ithout regard to care or lack of care of either the customer or the bank."  13 Pa. Cons. Stat. § 4406(f).  The import of this language was addressed in Environmental Equipment & Service Co. v. Wachovia Bank, N.A., 741 F. Supp. 2d 705 (E.D. Pa. 2010) (Brody, J.).  That case arose out of a scheme by plaintiff's bookkeeper wherein the bookkeeper embezzled nearly $1 million from plaintiff through fraudulent banking practices undertaken in an account at Wachovia Bank.  Id. at 708–09.  Plaintiff sought to recoup its loses from Wachovia, alleging that it should have been suspicious of the bookkeeper's unusual banking activity over the course of nine years, during which she fraudulently indorsed checks made to vendors, altered checks by making them out to "Cash," or changed the amounts on checks.  Id. at 709–11.  Each month Wachovia sent the plaintiff an account statement, along with the cancelled

18

checks, but the bookkeeper would intercept the statements and returned checks and alter them.  Id. at 710–11.  When Wachovia asserted a defense under § 4406(f) because the plaintiff had not provided notice about unauthorized checks within the one-year time period, the plaintiff responded that § 4406(f) did not apply due to the bank's bad faith  Id. at 717–18.

The court first recognized that pre-1992, § 4406 required a bank to act in good faith before the limitations period would apply.  Id. at 719.  When the statute was amended in 1992, the legislature deliberately omitted any mention of "good faith" in § 4406(f), despite expressly including it in §§ 4406(d) and 4406(e).  The court thus found that such affirmative omission suggested that a bank's defense under § 4406(f) was not intended to be cabined by any good faith requirement.  Id. at 719.  Ultimately, the court refused to incorporate the UCC's general "good faith" requirement into the more specific § 4406(f) framework, reasoning that when one statute "speaks to a subject in a general way and another deals with a part of the same subject in a more specific manner, where they conflict, the latter prevails."  Id. (quoting Halifax Corp. v. First Union Nat'l Bank, 546 S.E.2d 696, 703 (Va. 2001)).

This interpretation of § 4406(f) has been espoused by the majority of courts in states that have adopted the UCC.  See Columbia Metal Prods. Co. v. First Nat'l Bank of Pawnee, No. 17-453, 2018 WL 4328261, at *7–8 (N.D. Okla. July 26, 2018) (finding no good faith requirement in Oklahoma's version of § 4-406(f)); Slate v. Byrd, 09-cv-852, 2013 WL 1103275, at *22 (M.D.N.C. Mar. 15, 2013) (same under North Carolina law); Pinigis v. Regions Bank, 977 So.2d 446, 450–57 (Ala. 2007) (same under Alabama law); Am Fed. Teachers, AFL-CIO v. Bullock, 605 F. Supp. 2d 251, 259 (D.D.C. 2009) (same under District of Columbia law); Chester Twp. Bd. Trs. v. Bank

One, N.A., No. 2005-G-2660, 2007 WL 1881311, at *7–8 (Ohio Ct. App. June 29, 2007) (same under Ohio law); Halifax, 546 S.E.2d at 703  (same under Virginia law).[2]

Based on the plain language of § 4406(f), together with the wealth of case law interpreting this statute, I find that § 4406(f) does not have a good faith requirement.  As RPCC concedes that it did not report any of DiCrecchio's fraudulent transactions to TD Bank until August 16, 2018, I find any alleged bad faith by TD Bank would not allow RPCC to escape the statue of repose's bar, under § 4406(f), as to fraudulent transactions appearing on bank statements prior to August 16, 2017.

> ### b.     Good Faith—The Repeater Rule of § 4406(d)

With respect to the repeater rule in § 4406(d), the question of good faith is more complicated.  I again set forth this provision for context:

> **d) Effect of failure to report unauthorized signature or alteration.—**If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by subsection (c), the customer is precluded from asserting against the bank:

---

[2]     In an effort to argue that the statute of repose in § 4406(f) is tempered by a duty of good faith, RPCC also cites to several Pennsylvania cases that it claims have found that "bad faith" prevents operation of the statute of repose.  None of the cases cited by RPCC, however, stand for this proposition or have facts analogous to those before me.  For example, in Pavex, Inc. v. York Federal Savings & Loan Association, 716 A.2d 640, 646 (Pa. Super. Ct. 1998), the Pennsylvania Superior Court did not address § 4406 at all.  Rather, it considered whether a different defense—the fictitious payee defense under 13 Pa.C.S. § 3405(a)(3)—constitutes an absolute defense or whether the bank must have acted in good faith to assert the defense.  Id. at 641.

RPCC also cites to Lichtenstein v. Kidder, Peabody & Co., Inc., 777 F. Supp. 423 (W.D. Pa. 1991) in which the plaintiff sued her brokerage firm attempting to recover money that was withdrawn from her checking account by her former husband using forged checks.  Id. at 415.  The bank argued that the one-year statute of repose for reporting forged checks to bank barred claims involving any checks honored more than one year prior to time the plaintiff notified the firm of the forgeries.  Id. at 416.  The court held that although a bank is not bound to a particular standard of care in order to benefit from the statute of limitations, "a bank which has engaged in fraudulent conduct should not be afforded the protection of section 4406."  Id. at 426.  Lichtenstein is distinguishable, however, because, as noted by the Court in Environmental Equipment, "Lichtenstein was based on UCC § 4-406 as it was prior to the 1992 amendments," which expressly stripped § 4406(f) of its "good faith" requirement.  Envt'l Equip., 741 F. Supp. 2d at 718 n.16.

> (1) the customer's unauthorized signature or any alteration on the item if the bank also proves that it suffered a loss by reason of the failure; and
>
> (2) the customer's unauthorized signature or alteration by the same wrongdoer *on any other item paid in good faith by the bank* if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not exceeding 30 days, in which to examine the item or statement of account and notify the bank.

13 Pa. Cons. Stat. § 4406(d) (emphasis added).  Subsection (e) goes on to explicitly state that "[i]f the customer proves that the bank did not pay the item in good faith, the preclusion under subsection (d) does not apply."  Id. § 4406(e).  As such, unlike § 4406(f), the Repeater Rule of § 4406(d) explicitly requires that the bank have paid the item in good faith.

The duty of "good faith" has been defined as "[h]onesty in fact and the observance of reasonable commercial standards of fair dealing."  13 Pa. Cons. Stat. § 1201(b)(20).  "The connotation of this standard is fairness and not absence of negligence."  UCC Text Appendix Q § 4-406

Consistent with these definitions, cases recognizing a bank's duty of good faith have emphasized that a bank's mere negligent actions are insufficient to constitute bad faith.  Rather, the bank must have acted with knowledge and/or malicious intent.  Pavex, Inc. v. York Federal Savings & Loan Association, 716 A.2d 640, 645 (Pa. Super. Ct. 1998) (noting that "a bank's mere failure to follow commercially reasonable banking procedures or to comply with its own policies may not constitute bad faith"); Lichtenstein v. Kidder, Peabody & Co., Inc., 777 F. Supp. 423 (W.D. Pa. 1991) (recognizing that a bank must have engaged in actual fraudulent conduct with intent to have acted in bad faith); see also New Props., Inc. v. Newpower, No. 259932, 2006 WL 2632310, at *7 (Mich. App. Sept. 14, 2006) (finding potential bad faith where bank employee had actual

knowledge of embezzlement and that embezzler was using embezzled funds to pay personal debts owed by embezzler to bank employee); Falk v. N. Trust Co., 763 N.E.2d 380, 387–88 (Ill. App. 2001) (finding possibility of bad faith where plaintiff alleged that the bank was on notice that the wrongdoer was acting in breach of her fiduciary duties to the plaintiff and given  the number of years and the numerous transactions alleged by the plaintiff).

Where, however, there is no evidence that a bank had notice or knowledge of the wrongdoing, that there was any concerted action of the bank and the wrongdoer, that the bank had any clear warning, or that the bank or its officers had personal benefit or gain, courts have declined to find bad faith.  See Estate of Clark ex rel. Clark v. Toronto Dominion Bank, No. 12-cv-6259, 2013 WL 1159014, at *9 (E.D. Pa. Mar. 21, 2013) (absent evidence of fraudulent concealment by the bank, claims not brought within one year are time-barred under § 4406); see also Kaplan v. JPMorgan Chase Bank, N.A., No. 14-cv-5720, 2015 WL 2358240, at *8 (N.D. Ill. 2015) (rejecting plaintiff's contention that bank acted in bad faith by accepting two forged signature cards adding signatories to plaintiff's account without even checking with plaintiff where plaintiff failed to provide any evidence that bank knew the signature cards were forged, that wrongdoer had no authority to add himself as a signatory, that bank knew plaintiff was not receiving her monthly account statements, or that bank failed to observe reasonable commercial standards of fair dealing).

Synthesis of this case law reveals that the term "bad faith" means more than a bank's negligence or mere failure to comply with banking standards or its own internal procedures. Rather, it requires affirmative action or a deliberate failure to act despite knowledge of the fraudulent transactions.  My review of the record reflects that the evidence produced by RPCC is insufficient to allow a reasonable jury to find that TD Bank acted in bad faith.  This evidence includes:

- TD Bank's own forms and banking industry standards required TD Bank to verify DiCrecchio's authority to open and transact on the Account.  According to RPCC's expert, standard industry practice required TD Bank to identify and contact PFFTC's Board with respect to the opening of the account.  TD Bank did not do so.

- One of TD Bank's opening forms is called a "Corporate Banking Resolution," the only possible purpose of which could be to determine whether a corporation has resolved to take action.  Therefore, according to RPCC's banking expert, TD Bank had reason to open the account "properly, carefully and with suspicion from the start" and to give it close monitoring for a year.  (Pl.'s Resp. Opp'n Summ. J. 10.)  Yet, TD Bank failed to complete crucial portions of its opening forms and did not typically do anything else to verify an individual's authority to open a corporate account.

- TD Bank's actions regarding maintenance of the account violated industry standards.  RPCC's banking expert Hansen opined that "[w]hen [TD Bank] learned that RPCC checks were passing through the PFFTC Account, it could and should have closed the PFFTC account and insisted on the reopening of an account in the name of RPCC."  (Expert Report of Peggy A. Hansen, Feb. 3, 2002 ("Hansen Report") 11.)

- When RPCC sought to add itself as a co-owner to the Account and began depositing checks into the Account, TD Bank failed to inform RPCC of its option to close the Account and open a new one or that there were compliance risks in depositing checks into an account RPCC did not own.  TD Bank let this continue for six years despite large wire transfer requests being made from the Account to a different account.  On one occasion Pumphrey renewed her request for change of ownership of the Account in conjunction with a request for an immediate wire of approximately $465,000 to another account.  TD Bank honored the wire request, but never added RPCC's name to the account.  (PASF ¶ 71; Def.'s Ex. 54.)

Even viewed in the light most favorable to RPCC, this evidence does nothing more than suggest that TD Bank acted negligently in its compliance with its own banking policies or general banking standards.  Wholly lacking is any showing that TD Bank had notice or knowledge of the wrongdoing, that there was any concerted action between TD Bank and DiCrecchio, that TD Bank had any clear warning, or that TD Bank had personal benefit or gain.  Nor does this evidence indicate that there were obvious red flags that TD Bank willfully disregarded.  Accordingly, RPCC has not created a genuine issue of fact as to whether TD Bank acted in bad faith.

2.      Whether TD Bank Failed to Exercise Ordinary Care

Although RPCC has not produced evidence of bad faith, it contends that § 4406 includes a separate standard of care for a bank seeking to rely on the Repeater Rule.  Specifically, RPCC notes that under § 4406(e), "[i]f subsection (d) [the Repeater Rule] applies and the customer proves that the bank *failed to exercise ordinary care* in paying the item and that the failure substantially contributed to the loss, the loss is allocated between the customer precluded and the bank asserting the preclusion according to the extent to which the failure of the customer to comply with subsection (c) and the failure of the bank to exercise ordinary care contributed to the loss."  13 Pa. Cons. Stat. § 4406(e)  (emphasis added).

Under the UCC, "ordinary care" means "observance of reasonable commercial standards." 13 Pa. Cons. Stat. § 3103. The Official Comment to § 3-405 provides that "[f]ailure to exercise ordinary care is to be determined in the context of all the facts relating to the bank's conduct with respect to the bank's collection of the check," including the names on the account, amount of check, circumstances of account opening, and actions of account holder.  UCC § 3-405, Official Comment 4; see also Dominion Const., Inc. v. First Nat'l. Bank of Maryland, 315 A.2d 69, 75 (Md. 1974) ("[W]hat constitutes a breach of 'reasonable commercial standards' must be decided in the context of a specific set of facts."); Lundgren v. Bank of Am., N.A., No. 11-cv-758, 2011 WL 4592801, at *5 (N.D. Cal. 2011) (holding that preclusion under section 4406(d) may be avoided "by establishing that the bank failed to exercise ordinary care in paying the item and that the failure contributed to the loss." (internal quotations marks omitted)).

RPCC points to evidence sufficient to create a genuine issue of material fact as to whether TD Bank failed to exercise ordinary care in paying on checks written by DiCrecchio.  Taken as true, this evidence could establish that TD Bank did not follow its own procedures or other

commercially reasonable standards in opening and maintaining the -5031 Account.  In turn, a reasonable juror could find that TD Bank bears some liability for RPCC's loss.  Accordingly, although RPCC is barred under the statute of repose from recovering on fraudulent transactions appearing on bank statements prior to August 16, 2017 (one year prior to RPCC's reporting of the fraud), I find that for fraudulent transactions appearing on bank statements after that time, RPCC could establish that some or all of the loss was a result of TD Bank's failure to exercise ordinary care.

3.     Whether Statements Were "Made Available" to "a Customer"

In an alternative argument, RPCC contends that the defenses of § 4406 require that a bank "send[] or make[] available *to a customer* a statement of account showing payment of items for the account . . . [that is] sufficient to allow the customer reasonably to identify the items paid."  13 Pa. Cons. Stat. § 4406(a) (emphasis added).  RPCC asserts that the -5031 Account was only in *PFFTC's* name and, in turn, statements for the Account were never made available to *RPCC*.  As TD Bank never formally recognized RPCC as a customer, RPCC presses that TD Bank could not have sent statements to RPCC.

This argument is meritless in two respects.  Primarily, if accepted, RPCC's claim that it was not a "customer" of TD Bank would render its UCC and common law negligence claims invalid.  It is well established that banks do not owe any duty of care to noncustomers and/or third parties.  Chemalloy Co., LLC v. Citibank, N.A., No. 22-1143, 2022 WL 2356776, at *5 (E.D. Pa. 2022) (citing Adkins v. Sogliuzzo, 625 F. App'x 565, 569 (3d Cir. 2015) ("Absent a special relationship, courts will typically bar claims of non-customers against banks."); Fragale v. Wells Fargo Bank, N.A., 480 F. Supp. 3d 653, 661 (E.D. Pa. 2020) ("[D]ecisions across the country,

including within Pennsylvania, have held that banks do not owe any duty of care to noncustomers and/or third parties.").

Moreover, the undisputed evidence reflects that RPCC was, in fact, the owner of the Account and that the name on the account was nothing more than mere formality.  PFFTC was the predecessor of RPCC and, once the new Market was fully operational, PFFTC ceased to exist. RPCC then conducted the same business as PFTCC (operation of the Market), had the same board of directors and officers, and existed at the same address.  The evidence also indicates that RPCC used the -5031 Account over a period of multiple years, with checks signed by RPCC's Board members, to conduct its legitimate business of running the Market.  (Def.'s Exs. 31–38, 77, 264.) RPCC has already conceded that TD Bank sent or made available bank statements for the -5031 Account showing amounts paid to the joint address used by both companies.  (DSUF ¶ 55; PR ¶ 55.)  Pumphrey and DiCrecchio—both of whom worked for PFFTC and subsequently RPCC— were responsible for reviewing monthly account statements for PFFTC and RPCC.  (Binck Dep. 119:24–21; Pumphrey Dep. 40:12–41:24, 43:6–45:20.)  The monthly account statements for the -5031 Account reflected that hundreds of checks written from the -5031 Account had PFFTC's name on them.  (DSUF ¶ 58; PR ¶ 58; Def.'s Ex. 263.)  RPCC Board members never raised concerns about not receiving bank statements or receiving statements only in PFFTC's name. (Binck Dep. 18:3–21:13; Penza Dep. 31:14–33:7, 37:1–13; DiCrecchio Dep. 56:4–13; Dep. of Mark Levin ("Levin Dep.") 78:5–14; Dep. of John Vena ("Vena Dep.") 71:15–72:11.)

Given the undisputed evidence, I find no issue of fact as to whether RPCC was TD Bank's customer and the owner of the -5031 Account.  This evidence shows that RPCC received bank statements, thereby triggering the availability of the defenses in § 4406.

4.       Whether It Was Reasonable for RPCC, Acting Through Pumphrey, to Have Discovered the Unauthorized Transactions

RPCC next argues that both the Repeater Rule and the statute of repose require that a customer be able to have "reasonably" discovered the unauthorized payment.  Although TD Bank presses that Pumphrey was RPCC's agent for the purpose of receiving and reviewing RPCC's statements, RPCC responds that TD Bank opened the Account without ever engaging with the appropriate decisionmakers, *i.e.*, the Board acting through the Corporate Secretary.  Citing to the laws of agency, RPCC asserts that TD Bank's provision of bank statements to Pumphrey, who was a rogue employee and therefore not an agent of RPCC, was misplaced and bars TD Bank from relying on § 4406.

This argument disregards the well-established principle that the discovery rule does not apply to toll the limitations period for a UCC negligence claim.  In Menichini v. Grant, 995 F.2d 1225 (3d Cir. 1993), the United States Court of Appeals for the Third Circuit confronted the issue of "whether, in a case involving conversion of negotiable instruments, the 'discovery rule' applies when a party not engaged in fraudulent concealment invokes the statute of limitations."   Id. at 1228.  There, the bookkeeper of the plaintiff's company was discovered to have been embezzling company funds over a period of two years by forging the plaintiff's signature and depositing checks made payable to him into her personal account.  Id. at 1227–28.  The Court observed that the Code drafters "sought quick and inexpensive resolution of commercial  disputes." Id. at 1231. As such, the Court predicted that, "under Pennsylvania law, in the absence of fraud by those invoking the statute of limitations, a cause of action for conversion of negotiable instruments accrues when, irrespective of the plaintiff's ignorance, the defendant wrongfully exercises dominion." Id.

Subsequently, in <u>Estate of Hollywood v. First Nat'l Bank of Palmerton</u>, 859 A.2d 472 (Pa. Super. Ct. 2004), the Pennsylvania Superior Court rejected application of the discovery rule to toll the statute of limitations for UCC claims of conversion of negotiable instruments and unauthorized payment of checks, holding that:

> [L]ike claims for conversion, those for unauthorized payment accrue, and the limitation period prescribed by section 4-406 begins to run, when the instrument is negotiated . . . . The limitations period applies mechanically and, in the absence of evidence of fraudulent concealment by the defendant, claims not brought within one year are time-barred . . . ."

<u>Id.</u> at 483.

Judge J. Curtis Joyner addressed the same issue in <u>Estate of Clark ex rel. Clark v. Toronto Dominion Bank</u>, No. 12-cv-6259, 2013 WL 1159014 (E.D. Pa. Mar. 21, 2013). There, the plaintiff's estate alleged that there were a series of unauthorized withdrawals from the plaintiff's account that were used to pay outstanding balances owed by numerous unidentified customers of the various retail defendants. <u>Id.</u> at *1. The plaintiff's estate asserted that the UCC limitations period in section 4-406 should be tolled because the plaintiff had become mentally incompetent due to Parkinson's Disease and, therefore, was unable to provide the required notice. <u>Id.</u> at *5. Judge Joyner disagreed, finding that the discovery rule was not appliable to toll any limitations period. <u>Id.</u> *9; <u>see also Deutsch v. Wells Fargo Bank, N.A.</u>, No. 13-cv-3914, 2015 WL 3833226, at *7 n.8 (E.D. Pa. June 22, 2015) ("The Court looks to *Defendant's* actions, not Plaintiff's awareness" to toll the UCC limitations period (emphasis in original)).

Applying these principles, Pumphrey's alleged "rogue" actions have no relevance here. It is undisputed that TD Bank sent monthly bank statements for the -5031 Account to PFFTC at the address of 6700 Essington Avenue Avenue, which was also RPCC's address. (Def.'s Exs. 31–38, 77, 264; DSUF ¶ 55; PR ¶ 55.) RPCC's Board had designated Pumphrey and DiCrecchio as

responsible for reviewing monthly account statements for RPCC.  (Binck Dep. 119:24–21; Pumphrey Dep. 40:12–41:24, 43:6–45:20.)  The monthly account statements showed that hundreds of checks written from the -5031 Account only had DiCrecchio's signature and revealed regular payments to Jonathan Advisors.  (DSUF ¶ 58; PR ¶ 58; Def.'s Ex. 263.)  Pumphrey was the only individual who ever reviewed PFFC or RPCC bank statements prior to DiCrecchio's confession. No one else at RPCC was designated to review monthly account statements, and Board members did not raise concerns about not receiving bank statements.  (Binck Dep. 18:3–21:13; Penza Dep. 31:14–33:7, 37:1–13,  DiCrecchio Dep. 56:4–13; Levin Dep. 78:5–14; Vena Dep. 71:15–72:11.) TD Bank bears no responsibility for RPCC's decision as to which of their employees to trust. Given that TD Bank provided the requisite statements, the discovery rule does not apply to protect RPCC from Pumphrey's decisions to hide DiCrecchio's fraud.

>  5.  Whether TD Bank Fraudulently Concealed DiCrecchio's Embezzlement

Lastly, RPCC argues that sufficient evidence exists to establish that TD Bank fraudulently concealed DiCrecchio's embezzlement from RPCC.  RPCC posits that TD Bank engaged in "unintentional deception" by (a) providing Opening Forms which implied that dual-signature accounts were offered by TD Bank; (b) engaging in a pattern of noncompliance with its own forms; (c) continuing to process transactions on the Account for years after learning that PFFTC's operations had moved to RPCC.

Fraudulent concealment can constitute a limitation on the otherwise mechanical operation of the statute of repose.  See Estate of Hollywood, 859 A.2d at 483 (noting that the limitations period of § 4406 "applies mechanically and, in the absence of fraudulent concealment by the defendant, claims not brought within one year are time-barred." (emphasis added)).  Repeatedly, courts within this Circuit have found that fraudulent concealment by a bank can toll the limitations

period of § 4406.  See, e.g., Envt'l Equip., 741 F. Supp. 2d at 728 (noting that "the statute of limitations in commercial transactions [under § 4406(f)] may be tolled if the defendant is found to be guilty of fraudulent concealment."); Deutsch, 2015 WL 3833226, at *7 n.8 ("[A]bsent fraudulent concealment, the statute of limitations runs from the date of Defendant's compliance with Section 4401(a) as to this disputed transaction."); Estate of Clark, 2013 WL 1159014, at *8–9 (E.D. Pa. Mar. 24, 2013) (acknowledging that fraudulent concealment could act to toll the time in § 4406(f)).

Equitable tolling based on fraudulent concealment requires a plaintiff to prove "three necessary elements:  (1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to her lack of reasonable diligence in attempting to uncover the relevant facts."  Cetel v. Kirwan Fin. Grp., 460 F.3d 494, 509 (3d Cir. 2006).

The first of these factors requires a plaintiff to establish that the defendant engaged in an "affirmative independent act of concealment upon which the plaintiff [] justifiably relied."  Bucci, 591 F. Supp. 2d at 787 (quoting Kingston Coal Co. v. Felton Min. Co., Inc., 690 A.2d 284 (Pa. Super. 1997)); see also Glaziers and Glass Workers Union Local No. 252 Annuity Fund v. Janney Montgomery Scott, Inc., 155 F.R.D. 97, 101 (E.D. Pa. 1994) (applying statute of limitations where plaintiffs failed to allege an affirmative act of concealment that would have misled or diverted plaintiffs from discovering the alleged fraud).  The Third Circuit has stressed that a "plaintiff must show *active misleading* by the defendant."  Forbes v. Eagleson, 228 F.3d 471, 486 (3d Cir. 2000) (emphasis in original).  Fraudulent concealment may occur in situations of unintentional deception, *i.e* "where a deception, albeit unintentional, results in the concealment of a plaintiff's claim such that an action is not brought within the generally applicable statute of limitations."  Conneen v.

Amatek. 238 F. Supp. 3d 652, 658 (E.D. Pa. 2017) (citing Fine v. Checchio, 870 A.2d 850, at 860 (Pa. 2005)).  Nonetheless, "[w]hile fraud and constructive fraud may be established by omission, 'silence in the absence of a duty of a duty speak' cannot suffice to prove fraudulent concealment." Bucci, 591 F. Supp. 2d at 787 (quotation omitted).  As such, an allegation that a bank has failed to disclose a wrongdoer's banking activities does not constitute affirmative conduct on the part of the bank that would demonstrate the required act of concealment.  Bucci, 591 F. Supp. 2d at 787.

The party asserting fraudulent concealment has the "burden of proving such fraud or concealment, by evidence which is clear, precise and convincing."  Molineux v. Reed, 532 A.2d 792, 794 (Pa. 1987).  Thus "when plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek summary judgment on the issue, a court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their . . . claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercise reasonable diligence, *and* (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim within the limitations period measured backwards from when the plaintiffs filed their complaint."  Forbes, 228 F.3d at 487 (emphasis added).  "Absent evidence to support these findings there is no genuine issue of material fact on the issue and the defendants are entitled to summary judgment." [3]  Id.

---

[3]      Plaintiff relies heavily on my ruling on Defendant's Rule 12(b)(6) motion wherein I found that Plaintiff had plausibly alleged fraudulent concealment by asserting that Defendant misrepresented the Account's single signer status and failed to require evidence of a Board resolution to open the Account. That ruling, however, was premised on my obligation to accept the allegations of the Complaint as true and to draw all reasonable inferences therefrom in the light most favorable to Plaintiff.  At the summary judgment stage, the burden falls on Plaintiff to bring forth evidence creating a genuine issue of material fact on whether Defendant engaged in fraudulent concealment.

Here, none of RPCC's evidence, even taken as true, raises any specter of fraudulent concealment.   First, RPCC posits that TD Bank provided "customer-facing" documents—*i.e.*, documents provided directly to and signed by RPCC about RPCC's accounts—which implied that dual signature accounts were offered by the bank and justified RPCC's expectations of a two-signer account.   A review of these documents   belies any notion that RPCC had a justified expectation that its account would have two signers.

The Business Signature Card appeared as follows:



(Def.'s Ex. 2.)

The For Profit Banking Resolution showed the following:



(Def.'s Ex. 9.)

While both of these documents—which ask about the "number of signatures required" or include extra signature lines—suggest a possibility that more than one signer could be required, nothing in these documents could establish "active misleading" or create a reasonable belief that the accounts would be two-signer accounts.  And any such belief by the Board that the Account required more than one signature for checks is rendered unreasonable by other evidence.  TD Bank's Deposit Account Rules and Regulations ("Account Agreement") expressly provided that:

> **No Two-Signer Accounts.** We do not offer accounts on which two
> or more signatures are required for a check or other withdrawal.
> Notwithstanding any provisions to the contrary on any signature
> card or other agreement you have with us, you agree that if any
> Account purports to require two or more signers on items drawn on
> the Account, such provision is solely for your internal control
> purposes and is not binding on us.  If more than one person is
> authorized to write checks or draw items on your Account, you agree
> that we can honor checks signed by any Authorized Signer, even if
> there are two or more lines on the items for your signature and two
> signatures are required.[4]

(Def.'s Ex. 67; Robinson Dep. 92:3–8; 148:11–23.)

In addition, as noted previously, TD Bank regularly mailed monthly account statements showing copies or images of checks bearing only one signature.  (Def.'s Exs. 31–38.)  At no point did the Board members ask to see any of account agreements that applied to the Account or any of the monthly Account statements.  (Vena Dep. 31:6–32:5; DiFeliciantonio Dep. 50:4–1; Penza Dep. 100:21–101:7; Manos Dep. 87:12–88:13, 103:4–19, 107:1–6.)  RPCC has pointed to no evidence suggesting that (a) TD Bank knew that RPCC believed that the Account was a two-signer account and failed to correct that mistaken belief, or (b) had a clear obligation to affirmatively and directly communicate that the Account was only single signer account.

Second, RPCC asserts that TD Bank's "pattern of non-compliance" with its own forms and standard industry practice further misled RPCC into a "false sense of security about the compliance mechanisms [TD Bank] provided and caused them to relax their vigilance in investigating further." (Def.'s Resp. Opp'n Summ. J. 19.)  RPCC, however, presents no evidence that it had a reasonable

---

[4]     RPCC presses that there is no evidence that it ever received a copy of this Account Agreement. Notably, however, a TD Bank representative testified that the Bank *always* provides copies of this document to customers.  DiCrecchio further testified that he had no reason to doubt that he received a copy of it.  RPCC produces no contrary evidence sufficient to create a question of fact on this issue. Moreover, RPCC fails to produce any evidence that (a) TD Bank represented that the -5031 Account would be a two-signer Account, or (b) non-receipt of this particular document would negate TD Bank's existing policy to not provide two-signer accounts.

belief, based on a representation by TD Bank, that this information would be completed.  Indeed,

TD Bank has presented uncontroverted evidence that its policies did not require that all the information

on its forms be filled in.  (Robinson Dep. 126:7–127:13; McMahon Dep. 104:17–105:18.)  Moreover,

even if RPCC could show that TD Bank should have—in the course of industry standards—

ensured that all of the information on its forms was completed when opening an account, such a

showing would only sound in negligence.  It would not, as a legal matter, constitute an affirmative

act of misrepresentation on which RPCC justifiably relied.

Finally, RPCC contends that TD Bank continued to process RPCC's transactions on the

Account for years even though the Account was still held in PFFTC's name, which allowed

DiCrecchio to continue perpetrating his embezzlement scheme.  I have already found, however,

that the name on the account was nothing more than an administrative formality.  RPCC fails to

explain how such failure to replace "PFFTC" with "RPPC" on the Account records and statements

constituted fraudulent concealment, particularly when PFFTC was a defunct organization, RPCC's

own Board members ran PFFTC, and RPCC Board members repeatedly signed checks bearing

PFFTC's name for use in RPCC's business.  No one on the Board questioned why the checks had

PFFTC's name or why they were able to authorize a check with only one signature.[5]  (Binck Dep.

22:14–25:12; Manos Dep. 235:3–2371:1; DeFeliciantonio Dep. 151:3–165:4; Penza Dep. 43:16–

45:20.)  Moreover, far from concealing that it was processing checks through the Account, TD

Bank sent monthly statements regarding this Account showing images of checks signed by

RPCC's Board members with PFFTC's name.  The fact that the sole person employed by RPCC

---

[5]     Plaintiff argues that its Board members uniformly testified that they believed they had only one
checking account with Defendant to which RPCC had been added as an accountholder.  But this
argument does not address: (1) how the conversion of the account from PFFTC to RPCC would have
prevented DiCrecchio's embezzlement or otherwise alerted Board members who did not look at any
account statements, or (2) why the Board members were not alerted by checks written on the Account
that had only one signer.

to review these statements actively participated in the embezzlement does not suggest any affirmative concealment by TD Bank.

In sum, RPCC has failed produce evidence that would allow a reasonable factfinder to conclude that TD Bank engaged in any affirmative independent act of concealment—intentional or not—upon which RPCC reasonably relied. RPCC's fraudulent concealment defense is based on (a) omissions about which TD Bank had no duty to speak and (b) the alleged failure of TD Bank to discover DiCrecchio's banking activities. Taking the evidence in the light most favorable to RPCC, RPCC has not pointed to any affirmative conduct by TD Bank or its employees. While RPCC could perhaps show that TD was negligent in ensuring compliance with its own procedures and monitoring the account, to allow such negligence to rise to the level of fraudulent concealment would run counter to the stated legislative goal behind the Pennsylvania UCC which seeks to shift the risk of loss to customers who receive bank statements that alert them to discrepancies in their transactions. See Envt'l Equip., 741 F. Supp. 2d at 715. Therefore, the statute of repose in § 4406(f) cannot be tolled. In turn, RPCC's statutory negligence claims are barred as to all transactions prior to August 16, 2017.

### B.   Common Law Negligence Claim

RPCC also brings common law negligence claims premised on two theories: (1) TD Bank was negligent by permitting DiCrecchio to open the -5031 Account, and (2) TD Bank was negligent by allowing DiCrecchio to use the -5031 Account to conduct allegedly unauthorized transactions. TD Bank responds that both theories fail for multiple reasons.

1.      Whether the Pennsylvania UCC Displaces Common Law Negligence

TD Bank first re-raises an argument pressed in its motion to dismiss: that the Pennsylvania

Commercial Code displaces RPCC's common law negligence claims based on allegedly

unauthorized transactions.[6]

The Pennsylvania Commercial Code displaces common law claims when two

circumstances are satisfied: (1) the Code supplies a comprehensive remedy to the claim and (2)

reliance on the common law rather than the Code would thwart the Code's purposes. H.G. Litig.

Grp., LLC v. TD Bank, N.A., NO. 22-305, 2022 WL 1103791, at *2 (E.D. Pa. Apr. 13, 2022).

Nonetheless, not all common law negligence claims are foreclosed by the Code. "[I]t is well

established in the Third Circuit . . . that under some fact patterns, a plaintiff may maintain a

common law claim for negligence parallel to a claim under the [Code]." Bucci, N.A., 591 F. Supp.

2d at 781 n.7 (allowing a parallel common law negligence claim in an action involving forged

stock certificates) (citing New Jersey Bank, N.A. v. Bradford Secs. Operations, Inc., 690 F.2d 339,

346–47 (3d Cir. 1982); Universal Premium v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir.

1995)).

For claims based on use of false or fraudulent instruments, courts have repeatedly found

that the Commercial Code supplies a comprehensive remedy. In Environmental Equipment and

Service Company, supra, a case involving similar allegations to those here, the court granted

summary judgment on the plaintiff's common law negligence claims, holding that 13 Pa.C.S. §

3406 "creates a basic comparative negligence regime when checks have been altered or

---

[6]      Defendant does not contend that the Commercial Code displaces Plaintiff's common law
negligence claims based on negligent account opening. Case law suggests that such a claim is not
displaced. See Fragale v. Wells Fargo Bank, N.A., 480 F. Supp. 3d 653, 660 (E.D. Pa. Aug. 19, 2020)
(finding that plaintiff's claims premised on opening of an account and subsequently withdrawal of the
funds from that account are not preempted by the Commercial Code)

indorsements forged," and that 13 Pa.C.S. § 4406 "makes this regime even more intricate in cases of altered checks or forged drawer signatures where banks choose to provide their customers with account statements." Envt'l Equip & Serv. Co., 741 F. Supp. 2d at 713.   The court determined that "[t]his scheme provides a comprehensive remedy for the parties to the transaction—a delicate balance that would be disrupted by the allowance of common law negligence claims—and thereby satisfies the . . . displacement test, barring [plaintiff's] common law negligence action." Id. at 714; see also Assoc. Home and RV Sales, Inc. v. Bank of Belen, 294 P.2d 1276, 1280–81 (N.M. Ct. App. 2012) (holding that UCC § 4-406 sets out a comprehensive scheme of liability and defenses in commercial practices between banks and customers and provides a specific remedy for a plaintiff seeking redress from a bank after the passage of forged checks); 51 Frederick M. Hart, Nathalie Martin & William F. Willier, Forms and Procedures Under the Uniform Commercial Code § 41.03 (2012) (stating that the Code's "specificity preempts any common law negligence concepts regarding a bank's processing of checks").

Here, to the extent RPCC premises its common law negligence claim on DiCrecchio's drafting of checks against RPCC's funds without authority, I find that the Pennsylvania Commercial Code provides a comprehensive scheme of liability and defenses.   Permitting a parallel common law negligence claim would result in the undesirable consequence of RPCC being able to end run the statute of repose in § 4406(f).   Accordingly, I find that RPCC's common law negligence claims relating to TD Bank's processing of checks are preempted.

2.     Whether the Remaining Common Law Negligence Claim Is Time Barred

RPCC's sole remaining common law negligence claim pertains to TD Bank's allegedly negligent account opening.   TD Bank asserts that the statute of limitations on that claim expired on July 30, 2011, two years after -5031 Account was opened.

Under Pennsylvania law, claims for negligence are subject to a two-year statute of limitations. 42 Pa. Cons. Stat. § 5524(7).  This two-year limitations period is computed from the time the cause of action accrued.  42 Pa. Cons. Stat. § 5502(a).  In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion.  Fine v. Checcio, 870 A.2d 850, 857 (Pa. 2005).  Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute of limitations.  Id.

Unlike with statutory negligence claims, however, the statute of limitations for common law claims is subject to the discovery rule.  "The discovery rule is a judicially created exception to the general rule that a cause of action accrues when the wrongful conduct is committed.  It tolls the running of the statute of limitations until the party asserting the claim either knows or reasonably should know: 1) that he or she has suffered an injury; and 2) that the injury sustained was caused by the conduct of another party."  Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 12 F. Supp. 2d 391, 414–15 (M.D. Pa. 1998).  "[T]he discovery rule focuses not on the plaintiff's actual knowledge, but rather on whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff."  Mest v. Cabot Corp., 449 F.3d 502, 511 (3d Cir. 2006) (internal quotation marks omitted); see also Perelman v. Perelman, 545 F. App'x 142, 149 (3d Cir. 2013).

The party attempting to apply the discovery rule "bears the burden of demonstrating that he exercised reasonable diligence in determining the existence and cause of his injury."  Perelman, 545 F. App'x at 150 (internal quotations omitted).  "To demonstrate reasonable diligence, a plaintiff must establish[] that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others."  Mest, 449 F.3d at 511 (quoting Cochran v. GAF

Corp., 666 A.2d 245, 249 (Pa. 1995)).  Lack of knowledge, a mistake, or a misunderstanding will

not toll the statute.   See Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471

(Pa. 1983).  Although "the question of whether a plaintiff has exercised reasonable diligence is

generally a question for the jury, . . . the Court may decide that the discovery rule does not apply

as a matter of law where reasonable minds would not differ about whether the plaintiff knew or

should have known through the exercise of reasonable diligence of his injury and the cause of his

injury."  Harry Miller Corp. v. Mancuso Chems. Ltd., 469 F. Supp. 2d 303, 312–13 (E.D. Pa.

2007).

Here, RPCC's negligent account opening claim originally accrued on July 30, 2009, when

DiCrecchio opened the -5031 Account.  Accordingly, RPCC had two years, until July 30, 2011, to

bring a claim.  It failed to do so, however, until April 11, 2019, almost eight years later.

RPCC now claims entitlement to the discovery rule, arguing that:

> [T]he Board had no reason to suspect DiCrecchio's embezzlement
> scheme.  They employed reasonable safeguards, like hiring and
> relying on outside accountants and counsel, regularly counter–
> signing checks and balances on DiCrecchio's authority . . . . In the
> presence of counsel, the Board routinely discussed the health and
> status of RPCC's financials . . . . The Third Circuit has explained
> that a board's oversight duty "has never been understood as placing
> on directors the responsibility for day-to-day supervision of
> employees.  On the contrary, these quotidian tasks are the work of
> employee-supervisors."  Belmont, 708 F.3d 470 (3d Cir. 2013).
> Moreover, PFFTC and RPCC's Bylaws explicitly allow directors to
> "rely in good faith on information, opinions, reports or statements,
> including financial statements and other financial data, in each case
> prepared or presented by . . . officers or employees of the corporation
> whom the director reasonably believes to be reliable and competent
> in the matters presented." 15 Pa. C.S.A. § 5712 . . . Accordingly,
> RPCC delegated review of bank statements to its professional staff
> and review of other financial records to its professional accountants.
> . . . There was simply no reason to "awaken inquiry" into
> DiCrecchio's actions . . . . Rather, TD's own enormous failures to
> enforce its own account opening policies and procedures defeated
> RPCC's reasonable dual-signature precaution.  As such, a jury could

> reasonably find that the discovery rule applied to toll the statute of
> limitations until DiCrecchio confessed.

(Pl.'s Resp. Opp'n Summ. J. 21–22 (record citations omitted).)

RPCC's argument conflates two distinct legal principles.  RPCC's legal citations address only the questions of whether a *corporate director* may be held liable for negligent supervision of a corporate employee and to what extent a corporate director may delegate responsibilities to corporate employees in order to fulfill his/her fiduciary duty.  Pennsylvania's discovery rule is different.  It "requires that the plaintiff [corporation] use 'all reasonable diligence to inform himself or herself properly of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed statutory period.'"  Blanyar v. Genova Prods., Inc., 861 F.3d 426, 432 (3d Cir. 2017).   In other words, the discovery rule is concerned with the obligation of a *corporation itself*—acting through its board of directors—to use reasonable diligence in discovering wrongdoing and initiating appropriate litigation.  "Proof of a plaintiff's subjective knowledge is insufficient to invoke the discovery rule; a defendant can inquire what a reasonable plaintiff should know or should know to check."  Vitalo v. Cabot Corp., 399 F.3d 536, 543 (3d Cir. 2005).

I conclude that no reasonable jury could find that RPCC used "all reasonable diligence" yet still could not know about the fact that the -5031 Account was set up as a single-signer account until at least April 11, 2017, almost eight years after opening.  I base this finding on the following undisputed facts:

- PFFTC first began its banking relationship with TD Bank in 1998 when it opened the - 5470 Account.  (DSUF ¶ 2; PR ¶ 2.)  There is no evidence that this was anything other than a single signer account.

- On May 25, 2000, DiCrecchio opened the -3085 Account on behalf of PFFTC.  The Temporary Signature Card indicates that DiCrecchio was an authorized signer for this

Account.  There is no evidence regarding any other signer being listed on the -3085
Account.  (Def.'s Ex. 3.)

- No member of PFFTC's Board ever questioned the opening of these two accounts.
  Although several of RPCC's Board Members testified that they believed that the -3085
  Account was a two-signer Account, there is no evidence regarding the basis for this belief.
  (DSUF ¶ 7; PR ¶ 7.)

- On July 30, 2009, DiCrecchio—having already opened an account with TD Bank on behalf
  of PFFTC and acting as PFFTC's President/CEO—signed the Business Signature Card for
  the -5031 Account and affirmed that he was an "authorized individual," that he had the
  "required authority to act with respect to this account(s)," that TD Bank had "no
  responsibility or duty to assure or verify that Authorized individual(s) have or are acting
  within the authority given them . . .," and that DiCrecchio "agreed to the terms set forth in
  the Deposit Account Rules and Disclosure" and acknowledged that the bank "provided at
  least one copy of these deposit account documents."  (DSUF ¶ 15; PR ¶ 15.)

- After RPCC became operational, both PFFTC and RPCC used the -5031 Account to
  transact business, even though the -5031 Account remained in PFFTC's name.  Board
  members signed numerous checks bearing PFFTC's name during the time the -5031
  Account was opened.  RPCC admitted that its Board members were aware of the -5031
  Account, although they were unaware that it was still under PFFTC's name.  (DSUF ¶ 35;
  PR ¶ 35.)

- Aside from two email requests from RPCC's bookkeeper—an individual whose actions
  RPCC has disclaimed—the record is devoid of evidence regarding why these name
  changes did not occur.  No one on RPCC's Board insisted that the account name be changed
  to RPCC.  (Manos Dep. 234:1–9.)  Indeed, Board member DeFeliciantonio testified that
  he believed that PFFTC and RPCC were "two names for the same thing."  (DeFeliciantonio
  Dep. 68:12–69:14.)  Board member Vena was not sure which name was on the Account
  when it was opened.  (Vena Dep. 24:17–25:9.)  There is no evidence that anyone checked.

- Although RPCC's Board members believed that the -5031 Account was a two-signer
  account, the sole basis for their belief was that RPCC's bylaws required two signatures.
  They did not identify any bank paperwork or conversations with TD Bank that would have
  alerted TD Bank to the need to have a two-signer account.  (Penza Dep. 99:23-101:7; Vena
  Dep. 32:10–33:19; Manos Dep. 77:2–16.)

- No one from RPCC ever reported any unauthorized transaction to TD Bank until after
  DiCrecchio's confession in August 2018.  (DSUF ¶ 38; DR ¶ 38.)

- TD Bank sent monthly bank statements for the -5031 Account to "PFFTC" at the same
  address used by RPCC, 6700 Essington Avenue, Suite J232, Philadelphia, PA 19153.
  These statements contained copies of all checks written out of the -5031 Account.  (DSUF
  ¶ 54; PR ¶ 54.)  RPCC's money passed through the -5031 Account, but only DiCrecchio
  and Pumphrey reviewed these statements.  These statements also showed that hundreds of

checks written from the -5031 Account only had DiCrecchio's signature.  (DSUF ¶¶ 54–59;  PR ¶¶ 54–59.)  There is no evidence that any of RPCC's Board members ever questioned why bank statements came only in PFFTC's name, despite the fact that PFFTC no longer existed, but no bank statements came in RPCC's name.

- Although RPCC has produced evidence that the Board discussed general *financial* information at meetings, RPCC has offered no evidence that Board members ever asked to review *banking* information or bank statements at any time between the 2009 opening of the -5031 Account and July 2018.  Indeed, DiCrecchio testified that the Board never asked to see bank statements or invoices to support expenses paid.  (DiCrecchio Dep. 37:16–38:11.)  Only in the July 2018 meeting minutes did Board member George Manos indicated that he was "concerned" about the bank balances and proposed that each Board member receive the balances and account activity for each account on the 1st, 15th, and 30th of each month.  The minutes state that Manos "reiterated that these requests were to satisfy the Board's responsibility to know what is happening with RPCC's financials."  (Def.'s Ex. 91.)

In the face of this this evidence, no reasonable factfinder could find that RPCC "pursued the cause of [its] injury with those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others."  Mest, 449 F.3d at 511.  Although the Board was entitled to designate corporate employees to handle day-to-day banking responsibilities, the Board did not—during a period of almost eight years from the date the -5031 Account was opened—review account opening documents, question why checks had only PFFTC's name on them, inquire why some checks had only one signature, ensure the soundness of account balances, or review a single monthly bank statement for the Account.  The Board members cited no basis for their beliefs that the Account was a dual-signer account and that it was in RPCC's name, nor were they able to point to any evidence that affirmatively put TD Bank on notice that the account was to be a two-signer account with only RPCC's name.  Likewise, RPCC fails to identify any obstacle that precluded the Board members, over the course of many years, from periodically reviewing the bank statements.  In fact, as noted above, in July 2018, one of RPCC's Board Members actually proposed that the Board should engage in such periodic review of bank accounts.  Such evidence suggests that the Board abdicated

any oversight of its employees with respect to banking, a far cry from meeting its burden of proving the exercise of reasonable diligence.  As no genuine issue of fact exists on this issue, I find that the discovery rule does not apply.

Absent the discovery rule, RPCC's common law negligence claim based on negligent account opening accrued on the date the -5031 Account was opened, *i.e.*, July 30, 2009.  In turn the statute of limitations expired on July 30, 2011.  As RPCC failed to bring suit until April 11, 2019,  summary judgment is warranted on this claim.[7]

**C.     Statutory Conversion Claim**

Finally, TD Bank seeks summary judgment on RPCC's conversion claim on three grounds: (1) any UCC-based conversion claim relating to transactions prior to April 11, 2016 is barred by the statute of limitations; (2) RPCC, as the issuer of the check, cannot bring a conversion claim; and (3) to the extent RPCC premises its claim based on the deposit of its funds into the -5031 account, it does not constitute conversion.

1.      Statute of Limitations

Under 13 Pa.C.S. § 3118(g), any claim for conversion must be commenced within three years after the cause of action accrues.  In general, a claim for conversion accrues upon the date of the purported embezzlement.  Estate of Hollywood, 859 A.2d at 482–83.  As with negligence claims, the discovery rule does not apply for purposes of calculating accrual date of action for conversion.  Gress v. PNC Bank Nat'l Assoc., 100 F. Supp. 2d 289, 292–93 (E.D. Pa. 2000); Calex Express, Inc. v. Bank of Am., 401 F. Supp. 2d 407, 411 (M.D. Pa. 2005).

---

[7]       Defendant sets forth three other bases for dismissal of the common law negligence claims:  (a) Plaintiff ratified DiCrecchio's actions; (b) Defendant had no duty to monitor Plaintiff's account for fraud; and (c) the Account Agreement bars the account-use negligence claim.  Having dismissed the common law negligence claims on other grounds, I need not address these arguments.

Here, RPCC filed its state court action alleging conversion on April 11, 2019. Under the three-year statute of limitations, all transactions that occurred prior to April 11, 2016 are time barred. As to those claims, I will grant summary judgment in favor of TD Bank.

2.   Whether RPCC Was the "Issuer" of the Check

TD Bank also contends that RPCC used the -5031 Account for its own business and thus was the "issuer" of checks from the Account. In turn, it urges that RPCC may not maintain a claim for conversion for any checks it wrote against the -5031 Account.

Under the statute, "[a]n action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or a payee or indorsee who did not receive delivery of the instrument either directly or through delivery to an agent or a copayee."[8]   13 Pa. Cons. Stat. § 3420(a). Comment one to the statute explains that, "[t]here is no reason why a drawer should have an action in conversion. The check represents an obligation of the drawer rather than property of the drawer. The drawer has an adequate remedy against the payor bank for recredit of the drawer's account for unauthorized payment of the check." 13 Pa. Cons. Stat. § 3420, cmt. 1.

Repeatedly, courts have dismissed statutory conversion claims where an agent of the issuer, whose corporate name appears at the top of each check, signs the check on behalf of the issuer. See, e.g., Sebastian v. D&S Exp., Inc., 61 F. Supp. 2d 386, 390 (D.N.J. 1999) (finding, under Pennsylvania law, that a company could not bring a conversion claim against bank for cashing checks issued by company president to fictitious payees because president was agent of company, making the company the issuer of the checks); Citizens Bank of Pa. v. Chevy Chase Bank, No. 03-cv-5208, 2004 WL 875499, at *2 (E.D. Pa. Mar. 22, 2004) (finding that statutory conversion claim

---

[8]     An "issuer" is a "maker or drawer" of an instrument. 13 Pa. Cons. Stat. § 3105(c). A "drawer" is the "person who signs or is identified in a draft as a person ordering payment," and a "maker" is a "person who signs or is identified in a note as a person undertaking to pay." 13 Pa C.S.A. § 3103(a).

was barred where plaintiff company issued a check that was accepted for deposit over a forged endorsement).

Here, it is undisputed that DiCrecchio signed all of the disputed checks on behalf of RPCC out of the -5031 Account. Accordingly, RPCC is the issuer of the checks and, in turn, is barred from bringing a statutory conversion claim.

In order to avoid the bar imposed by the statute, RPCC responds that TD Bank deposited checks made out to RPCC into an account owned only by PFFTC. RPCC asserts that this was not commercially reasonable because RPCC's Board had no knowledge that its funds were passing through an account owned wholly by PFFTC and was under the belief that the Account was properly in the name of RPCC. As RPCC's name was never added to the Account or to the checks drawn on it, RPCC presses that it cannot be regarded as the "issuer" or "drawer" of the instruments DiCrecchio used to wrongfully withdraw funds from the Account. Accordingly, RPCC concludes that PFFTC, not RPCC, was the issuer of the unauthorized checks that DiCrecchio wrote.

Again, RPCC's argument creates somewhat of contradiction. To the extent RPCC claims that it was never the owner of the -5031 Account or used the Account as its own, RPCC is precluded from pursuing any conversion claims premised on fraudulent checks written on funds present in the -5031 Account. In other words, if RPCC concedes that it was not the owner of that Account or the funds therein, it was thus not harmed by the issuance of checks from that Account.

As I have concluded, however, RPCC was, in fact, an owner of the Account. RPCC admits that PFFTC was its predecessor and RPCC assumed all responsibilities and assets of PFFTC. PFFTC and RPCC had the same board of directors, the same address, and the same responsibility for management of the Market. Board member DeFeliciantonio testified that he believed that PFFTC and RPCC were "two names for the same thing." (DeFeliciantonio Dep. 68:12–69:14.)

Board member Vena was not sure which name was on the Account when it was opened.  (Vena Dep. 24:17–25:9.)  Moreover, irrespective of RPCC Board members' subjective beliefs about the ownership of the -5031 Account, the fact remains that they repeatedly wrote checks for RPCC business from the -5031 Account and conducted RPCC business through this Account.  RPCC Board members used -5031 Account checks as their own.  In that regard, RPCC was the issuer of the checks used by DiCrecchio to wrongfully withdraw funds, in which case its conversion claims are barred.

        3.    Whether RPCC Was Deprived of Funds

        Finally, to the extent RPCC premises its conversion claim on the deposit of RPCC funds into the -5031 Account, TD Bank claims that it also fails as a matter of law because RPCC was never deprived of property.

        Conversion is defined under Pennsylvania law as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification."  Premier Payments Online, Inc. v. Payment Sys. Worldwide, 848 F. Supp. 2d 513, 529 (E.D. Pa. 2012) (quotations omitted).  "Not every destruction or deprivation of property amounts to a conversion; there must be an actual appropriation of it by the offending party for his own use."  Win & Son, Inc. v. City of Philadelphia, 178 F. Supp. 3d 234, 242 (E.D. Pa. 2016) (quotations omitted).

        Here, RPCC's conversion claim fails because checks payable to RPCC and deposited into the -5031 Account were available for use by RPCC.  TD Bank did not possess that money at any point for its own use.  Bank statements reflect that RPCC actually used those funds to conduct its legitimate business.  (Def.'s Exs. 31–38.)  It was the *withdrawal* of those funds by DiCrecchio for

improper purposes—not the original deposit of those funds—that ultimately deprived RPCC of the use of the money.

RPCC alleges that TD Bank's deposit of checks made out to RPCC into an account owned only by PFFTC was "not commercially reasonable." Commercial reasonableness or unreasonableness, however, does not counter the undisputed evidence that RPCC was not actually deprived of those funds.

RPCC also asserts that TD Bank should be liable for the full amount of the funds that were not received by RPCC because DiCrecchio wrongfully withdrew them. In support, it cites Option One Mortgage Corporation v. Fitzgerald, 687 F. Supp. 2d 520 (M.D. Pa. 2009), wherein the court found that the bank had converted funds where a check was made out to three different parties—none of whom were named in the alternative—but was indorsed by only two of the parties and deposited with the bank, which accepted the check without the third party's indorsement. The court noted that the bank had made payment with respect to an instrument to a person who was not entitled to enforce the instrument or receive payment. Id. at 527–28. The two parties that indorsed the check then spent the proceeds on personal expenses. Id. at 528. The third party ultimately had no access to the funds.

By contrast here, the checks deposited into the -5031 Account were made out solely to RPCC. Once deposited, the funds were solely available to RPCC, and RPCC used the funds in the -5031 Account for its own legitimate business purposes. When DiCrecchio withdrew the funds, he was not acting as a third-party, but rather as the President and CEO of RPCC.

## IV.   CONCLUSION

In light of the foregoing, I will grant Defendant TD Bank's Motion for Summary Judgment in part and deny it in part.

As to RPCC's UCC negligence claim, RPCC is time barred from seeking recovery on any unauthorized transactions appearing on any statement prior to August 16, 2017. As to unauthorized transactions appearing on statements subsequent to that date, RPCC is also barred, under the Repeater Rule, from bringing any statutory negligence claims against TD Bank, except to the extent it can establish that some or all of the loss was a result of TD Bank's failure to exercise ordinary care with respect to those transactions.

As to RPCC's common law negligence claim, the Pennsylvania UCC displaces that claim to the extent it is premised on TD Bank's allowing DiCrecchio to write checks against RPCC's funds without authority. To the extent the common law negligence claim is premised on TD Bank's allegedly negligent account opening, that claim is time barred.

Finally, as to Plaintiff's conversion claim, the claim is barred to the extent it is premised on RPCC's issuance of checks from the -5031 Account. To the extent it is premised on TD Bank's deposit of RPCC's funds in the -5031, which bore only PFFTC's name, I find that Plaintiff has failed to produce any evidence that such deposits deprived RPCC of access to its funds.

An appropriate Order follows.